UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMICA SOUTHWARD,

    *Plaintiff*,

*v.*                                         CASE NO. 11-CV-14208

COMMISSIONER OF                  DISTRICT JUDGE ROBERT H. CLELAND
SOCIAL SECURITY,                  MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Plaintiff was 26 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 40.) Plaintiff's employment history includes work as a fast food cook and cashier for four years, a data entry clerk for six months, a retail sales clerk for three months and a shipping clerk at a warehouse for two months. (Tr. at 141.) Plaintiff filed the instant claims on September 10, 2007, alleging that she became unable to work on January 6, 2006. (Tr. at 19.)[2] The claims were denied at the initial administrative stages. (Tr. at 70, 71.) In denying Plaintiff's claims, the Commissioner considered affective disorders and substance addiction (alcohol) as possible bases for disability. (*Id.*) On November 4, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") Paul R. Armstrong, who considered the application for benefits *de novo*. (Tr. at 16-31; 33-69.) In a decision dated November 25, 2009, the ALJ found that Plaintiff was not disabled. (Tr. at 28.) Plaintiff requested a review of this decision on December 8, 2009. (Tr. at 118.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on July 28, 2011, when, after review of additional exhibits[3] (Tr. at 190-98), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-7.) On September 23, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.    Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is

---

[2] The reference is to the ALJ's opinion because copies of the applications themselves could not be located in the administrative record.

[3] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

**C.     Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI,

4

42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his]

5

past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through March 31, 2010, and that Plaintiff had not engaged in substantial gainful activity since January 6, 2006, the alleged onset date. (Tr. at 21.) At step two, the ALJ found that Plaintiff's affective disorders were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 22-24.) At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. at 26.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual age 18 to 49. (*Id.*) At step five, the ALJ found that Plaintiff could perform a full range of work at all exertional levels with the following nonexertional limitations: claimant is limited to low stress, unskilled, routine, simple, repetitive work, with intermittent to minimum contact with the general public, supervisors, and co-workers. (Tr. at 24-26.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 28.)

### E. Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff has been treated at Genesee County Community Mental Health ("GCCMH") since 2006 and Hamilton Community Health Network ("HCHN") Northpointe from March through June 2007. (Tr. at 245-57, 207-17.)

Plaintiff was treated at GCCMH for "trouble sleeping." (Tr. at 245.) Plaintiff also reported "some trouble eating and feeling like she is not as social as she was in the past." (*Id*.) Plaintiff also stated that she "got laid off in January and then was collecting unemployment," and that she had been "actively looking for a job." (Tr. at 245.) As to mental health symptoms, Plaintiff reported that she had not "felt depressed, sad or helpless most days" during the past month, that she was not a nervous person, that it was not hard for her to control her worry, that she did not "hear voices or see things that other people do not hear or see[,]" that she did not have "times when [her] thoughts race[d], or when [she had] less need for sleep lasting more than 1 week[,]" and that she did not have "thoughts or plans to hurt [herself] or others during the past 2 weeks[.]" (Tr. at 247.)

As to the functional assessment, Plaintiff reported that she had only mild problems (10 to 20%) making appointments on time, making her own meals, bathing, and cleaning her clothes, and that she had moderate problems (21 to 51%) paying bills and managing money, getting from one place to another without help, getting along with others, keeping her attention and concentration on tasks for a long time, completing routine tasks on time, and adapting quickly to change or stressful events. (Tr. at 247-48.) As to activities of daily living, Plaintiff reported no limitations. (Tr. at 248.) Plaintiff was also assessed to be "oriented x3[,]" alert/coherent, within normal limits as to attention and concentration, non-delusional, impoverished thought content, of fair impulse control, appropriate affect, and within normal limits as to reality, judgment and motor activity. (Tr. at 249.) Plaintiff was diagnosed with Mood Disorder NOS. (Tr. at 251.) While treated at HCHN, it was noted that Plaintiff's affect was "mildly flattened," but that her insight and judgment, recent and remote memory, and orientation as to person/place/time were all normal. (Tr. at 211-12.)

Plaintiff was also evaluated at New Passages behavioral health and rehabilitation services in May 2007. (Tr. at 199-206.) Plaintiff's evaluator noted that Plaintiff's appearance was "well groomed[,]" her mood was "depressed[,]" her attitude was "cooperative[,]" her speech was "normal[,]" and her thought process was "intact." (Tr. at 223.) Her thought content was "paranoid" and "obsessive," but there were no hallucinations or psychosis noted. (Tr. at 224.) The assessment's functional summary concluded that Plaintiff's strengths included daily activities,

7

cognitive functioning, social skills, and responsibility. (Tr. at 228.) Plaintiff was diagnosed with Manic Depressive NOS and alcohol dependency, and was assessed a GAF score of 58. (Tr. at 228-29.) In July 2007, upon discharge for Plaintiff's disengaging from services on June 28, 2007, it was noted that Plaintiff had been assessed as "presenting problems as history of severe depression, chronic suicidal ideation, abusive relationships, lack of natural supports and paranoia[,] . . . trouble sleeping and using alcohol every other day." (Tr. at 218.) On July 27, 2007, Plaintiff was diagnosed with Bipolar II - Depressed and was given a GAF score of 58. (Tr. at 219-20.) Plaintiff was again treated at New Passages from September 2007 through September 2008. (Tr. at 338-402.)

In December 2007, Plaintiff was evaluated at Seasons Counseling Center in Grand Blanc, Michigan, by Carrie Neubecker, Psy.D. (Tr. at 258-62.) Dr. Neubecker concluded that Plaintiff's score on the "DOT Counting Test" was a score "found in persons engaging in a high degree of embellishment or symptoms magnification" and that Plaintiff "seemed to act intentionally obtuse when I invited her into my office from the waiting room." (Tr. at 258.) Dr. Neubecker noted that when she asked Plaintiff about her difficulty sleeping, Plaintiff stated, "'Maybe the abortions I had. My kids be coming to me at night (aborted children).'" (*Id.*) Dr. Neubecker further noted that Tamica said that she had two abortions in 2001, that she has panic attacks daily, that she can't control her moods around people, that she "is depressed," and that she "does not feel like doing anything, such as leaving her house." (*Id.*) Plaintiff reported that she was "able to do cooking, cleaning and laundry[,] . . . [was] independent in self-care and personal hygiene[,] . . . able to grocery shop independently[,] . . . able to pay bills and count money[,] . . . [and do] community service to stay living in HUD Housing in Flint." (Tr. at 259.) Plaintiff's "hair was stylishly done with blond weaving" and her "hygiene and grooming appeared to be appropriate." (Tr. at 260.) Plaintiff's "speech was unimpaired [and her] stream of mental activity was spontaneous and organized." (*Id.*) Plaintiff denied any recent suicidal thoughts but reported that 4 months ago, she "'ran out in the middle of the street into oncoming traffic.'" (*Id.*) She stated that her mom called her dad and he "came out there trying to talk to [her]." (*Id.*) Plaintiff was diagnosed with

8

Depressive Disorder NOS and history of alcohol and marijuana abuse and was given a GAF score of 60. (Tr. at 261.)

A Mental RFC Assessment completed on January 14, 2008, by Ashok Kaul, M.D., concluded that Plaintiff was not significantly limited in understanding and memory or sustained concentration and persistence, but was moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. (Tr. at 265.) Plaintiff was also found to not be significantly limited in social interaction and adaptation, but was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 266.) The assessment also concluded that Plaintiff was "able to understand, remember and carry out simple instructions on a sustained basis" and was "[c]apable of unskilled work." (Tr. at 267.)

A Psychiatric Review Technique also completed by Dr. Kaul on January 14, 2008, diagnosed affective disorders (Depressive D/O NOS) and substance abuse disorders based on her history of alcohol and marijuana abuse. (Tr. at 269, 272, 277.) Plaintiff was found to be mildly limited in activities of daily living, and moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. at 279.)

Plaintiff was again treated at New Passages from March 2008 through June 2009. (Tr. at 283-337.) On March 26, 2008, Vicky Sprague, R.N., assessed Plaintiff and found her disheveled, depressed, cooperative but emotional and tearful, oriented as to time, place and person, and without hallucinations, although she noted that Plaintiff "claims she hears things that are not really there, but does not appear to be auditory hallucinations." (Tr. at 286.) In the functional summary, Sprague found only concerns and did not find any strengths in any of the functional categories. (Tr. at 288.)

On October 24, 2008, it was noted that Plaintiff did not have any side effects from medication and that her condition was "[r]elatively stable, depression improving." (Tr. at 397.)

In January 2009, Plaintiff was diagnosed by Venkat K. Rao, M.D., with "mild obstructive sleep apnea" and was advised to "use the CPAP." (Tr. at 405, 456.) Dr. Rao also noted that

9

Plaintiff's "pulmonary function test does not show any evidence of airflow obstruction" and that her "anxiety/depression" might also play a role in her sleep disruption. (*Id.*) Dr. Rao also "counseled her a lot about cutting down her calories and starting to exercise." (*Id.*)

On May 19, 2009, David Vila, M.D., evaluated Plaintiff and diagnosed panic disorder, mixed, recurrent, assessed a GAF score of 40, and continued Plaintiff's prescription medications. (Tr. at 313, 316, 319.)

On June 12, 2009, Jennifer Kreiner, M.S.N., completed a Medical Source Statement and concluded that Plaintiff was moderately limited in her ability to relate and interact with supervisors and co-workers, markedly limited in her ability to understand, remember and carry out an extensive variety of technical and/or complex job instructions, mildly limited in her ability to understand, remember and carry out simple one- or two-step job instructions, markedly limited in her ability to deal with the public, moderately limited in her ability to maintain concentration and attention for at least two hour increments, moderately limited in her ability to withstand the stress and pressures associated with an eight-hour work day and day-to-day work activity, and mildly limited in her ability to handle funds. (Tr. at 299.)

In her Daily Function Report, Plaintiff indicated that she is able to take care of her personal needs, but added that she changes her clothes constantly, bathes once a day, "do[es]n't feel like dealing with my hair, so I wear wigs to cover it up," and that she "do[es]n't have barely any eyelashes cause I pull them out when I'm upset and moody." (Tr. at 148.) Plaintiff also indicated that she does not need reminders, is able to prepare her own meals, is able to do laundry and clean "once a week and [it] takes 3 to 4 hours." (Tr. at 149.) Plaintiff also stated that she does not do outdoor work because she lives in an apartment. (Tr. at 149-50.) Plaintiff indicated that she goes outside "maybe (?) twice a week to get fresh air" but that she has stayed in the apartment for five months at a time. (Tr. at 150.) Plaintiff also stated that she is able to shop in stores twice a week and that she is able to walk to the corner store to shop for groceries. (*Id.*) Plaintiff also indicated that she is able to handle her own finances. (*Id.*) Plaintiff stated, "I also have an attitude and [am] very emotional about things, which causes me to not be around anyone," and that she "smoke[s]

10

at least 7 cigarettes a day to help calm [her] nerves" and to "help [her] from pulling all [her] eyelashes out." (Tr. at 152, 154.)

At the administrative hearing, Plaintiff testified that she lived alone and did not have any children. (Tr. at 41.) When asked when she stopped looking for work, Plaintiff responded, "I wasn't being hired" and that it occurred possibly in "June of 2006, July, somewhere in there." (Tr. at 46.) When asked why she stopped looking for work, Plaintiff responded, "I stopped looking because I wasn't getting hired and I just started becoming depressed." (Tr. at 46-47.) Plaintiff stated that she has been treated for depression, bipolar condition, and anxiety since 2006, but that she has never been hospitalized for any of these conditions. (Tr. at 47.) Plaintiff also stated that she is taking Zoloft and Risperdal for her depression and anxiety, and Naproxen for pain. (Tr. at 48-49.) When the ALJ asked her why she was prescribed pain medication, she stated that she "was having pains in [her] arms and legs and trouble with [her] menstrual cycle." (Tr. at 49.) When asked whether she had been hospitalized for any condition, Plaintiff responded, "No." (Tr. at 49-50.)

Plaintiff was also asked how she spends the day. She stated, "[a]t home on the couch, in the bed," where she watches television and listens to music. (Tr. at 50.) When asked what she does after she gets up in the morning, Plaintiff responded, "Not really nothing." (*Id.*) When further asked whether she gets dressed, Plaintiff stated, "No." (*Id.*) When asked whether she makes breakfast for herself or eats in the morning, Plaintiff stated, "No." (Tr. at 51.) She did, however, indicate that she fixes lunch for herself and then she will "[s]it back down" or "lay back down," but that she "don't do nothing." (*Id.*) Plaintiff testified that she paints on canvas "sometimes" and fixes dinner for herself. (Tr. at 52.) Plaintiff testified that she does not do any laundry. The ALJ asked her what happens when, inevitably, she runs out of clean clothes to wear – does she "just put on the soiled clothing all the time, over and over?" (Tr. at 53.) Plaintiff responded. "Yes." (*Id.*)

Plaintiff further testified that she does not vacuum, make her bed, or wash her linens. When the ALJ inquired how long this has been going on, Plaintiff responded, "For years, years." (*Id.*) Plaintiff added that she leaves dishes in the sink and that when she needs to use a dish, she washes

11

it before using it. (Tr. at 53-54.) Plaintiff is able to walk to the grocery store and carry the groceries home. (Tr. at 54-55.) When asked why then she does not do laundry or clean her home, Plaintiff responded, "I just don't feel like it." (Tr. at 55.) Plaintiff testified that she has a male friend that she visits once or twice a week and that she is able to take a bus to his house. (Tr. at 56-57.) Plaintiff testified that she drinks a 24-ounce beer when visiting him, but does not drink at home. (Tr. at 57.) She also stated that she has never used drugs, except "in 2001." (Tr. at 57.)

Plaintiff's counsel asked Plaintiff if she has panic attacks and she responded that she has them "[a]bout twice a week" and that they last for "[a]bout 30 to 45 minutes." (Tr. at 58.) Plaintiff stated that during a panic attack she "can't feel anything" and that her "face and body kind of go numb" and she feels "like little pins" are "sticking" her in her hands and face. (*Id.*) Plaintiff also testified that she has crying spells "[t]wice a week" and, when asked what brings them on, Plaintiff responded, "[j]ust being at home alone and just stuff going through my head that happened to me," such as her "sister passing[,]" "abusive relationships," and "abortions." (Tr. at 59.) Plaintiff also indicated that she attempted suicide by walking into traffic once. (*Id.*) Plaintiff stated that, at times, she will "hear someone saying [her] name and I get up and look to see if it's someone there, but it's nothing" and that she will think she sees somthing, but when she "get[s] up and see if it's something there, it's nothing." (Tr. at 60-61.) Plaintiff stated that she sees a psychiatrist and has a caseworker that "comes and visits [her] at home every two weeks to make sure [she's] okay and keeping up with everything." (Tr. at 81.)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider an individual with Plaintiff's background who:

> has a moderate inability to understand, remember and carry out detailed instructions and maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and she should also not be exposed to moving and dangerous machinery.

(Tr. at 63.) The VE responded that such a person could perform the 1,200 to 1,400 medium unskilled housekeeper jobs, the 1,800 to 2,000 cleaner II jobs, and the 800 to 1,000 night crew

12

clerk jobs available in Michigan. (Tr. at 63-65.) The VE further testified that the above jobs are all "low stress, not rigid production" jobs. (Tr. at 68.)

### F. Analysis and Conclusions

#### 1. Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: claimant is limited to low stress, unskilled, routine, simple, repetitive work, with intermittent to minimum contact with the general public, supervisors, and co-workers. (Tr. at 24-26.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

#### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ failed to properly consider nurse Jennifer Kreiner's opinion because, even though she is not a physician, "that certainly does not mean that her opinions were not entitled to significant weight in this matter." (Doc. 9 at 12.) Plaintiff further argues that the ALJ should have relied on Dr. Vila's assessed GAF score of 40. (Doc. 9 at 13-14.) Plaintiff also contends that the VE erred in classifying the housekeeper position as unskilled, that the ALJ's reliance on this testimony was error, and that the error was exacerbated when the "ALJ failed to even *detect* the conflict," which means that "he obviously did not fulfill his duty." (Doc. 9 at 16 (emphasis in original).) Finally, Plaintiff attributes error to the ALJ's "failing to account

13

for the further impact of plaintiff's obstructive sleep apnea, whether or not deemed to be a 'severe' impairment." (Doc. 9 at 16-17.)

### a. Jennifer Kreiner's Opinion

Plaintiff contends that the ALJ failed to properly consider Jennifer Kreiner's opinion because, even though she is not a physician, "that certainly does not mean that her opinions were not entitled to significant weight in this matter." (Doc. 9 at 12.) Jennifer Kreiner is a nurse practitioner with a Master's Degree in Nursing Science. Therefore, Kreiner's opinions and assessments are not opinions from an acceptable medical source as defined in the regulations. *See* 20 C.F.R. § 404.1513(a). Although Plaintiff is correct that the Commissioner "may also use evidence from other sources," including nurse practitioners, 20 C.F.R. § 404.1513(d)(1), that does not mean that the ALJ must accord any "significant" or other weight to the opinion. On the contrary, "[a] nurse is not an acceptable medical source; thus, [her] opinion is not entitled to any special weight or consideration." *Pendleton v. Astrue*, No. 11-307-KSF, 2012 WL 1571296, at *6 (E.D. Ky. May 3, 2012); *accord, Taylor v. Comm'r of Soc. Sec.*, No. 1:11-cv-46, 2012 WL 1029299, at *6 (W.D. Mich. Mar. 26, 2012). Accordingly, the ALJ is not required to explain the weight given nurse Kreiner's opinion nor is the ALJ required to give reasons why her opinion was discounted. *See also* S.S.R. 06-03p; *Ball v. Astrue*, No. 09-208-DLB, 2010 WL 551136, at *5 (E.D. Ky. Feb. 9, 2010). I therefore suggest that the ALJ's decision is not undermined by a failure to rely on the opinions or assessments made by Kreiner.

### b. GAF Scores

Plaintiff argues that the ALJ should have relied on Dr. Vila's assessed GAF score of 40. (Doc. 9 at 13-14.) However, neither the Commissioner nor the Sixth Circuit requires that GAF scores, even consistent ones, be given any weight at all:

> [T]he Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.

14

*Kennedy v. Astrue*, 247 Fed. App'x 761, 766 (6th Cir. 2007) (citations omitted) (finding that increase in GAF score from 55 to 60 was insignificant). Therefore, I suggest that the ALJ's decision not to rely on the GAF score is of little consequence and does not undermine the ALJ's substantial evidence finding. *See also Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 Fed. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

    **c.**    **DOT Conflicts**

Plaintiff contends that the VE erred in classifying the housekeeper position as unskilled, that the ALJ's reliance on this testimony was error, and that the error was exacerbated when the "ALJ failed to even *detect* the conflict." (Doc. 9 at 16 (emphasis in original).) However, in this Circuit, Social Security Ruling 00-4p is satisfied by the ALJ simply asking the VE if her testimony is consistent with the DOT. *Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 375-76 (6th Cir. 2006). Here, the ALJ asked the VE about the DOT classifications for each position mentioned, inquired into any variations from the DOT, and the VE responded to each of the ALJ's questions. (Tr. at 63-65.) Therefore, I suggest that the ALJ was not under any obligation to inquire further into the accuracy of the VE's testimony, especially in light of the fact that Plaintiff's counsel failed to assert at the hearing that any conflict existed. *See Ledford v. Astrue*, 311 Fed. App'x 746, 757 (6th Cir. 2008) ("Nothing in the applicable Social Security regulations requires an administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge").

I further suggest that even assuming, *arguendo*, that the ALJ had an obligation to inquire further into the classification of the housekeeper job challenged by Plaintiff, the VE's testimony regarding the other jobs, i.e., cleaner II and night crew clerk, remains unchallenged and would, by

15

itself, provide substantial evidence for the ALJ's conclusion that Plaintiff was not disabled. *See Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 374 (6th Cir. 2006) (noting that the ALJ had no affirmative duty to investigate whether VE was correct where the plaintiff did not bring any conflict to his attention and finding substantial evidence satisfied where, "even if the two positions about which there were inconsistencies had been excluded, the ALJ still could have found that [the plaintiff] could perform the third position").

### d.     RFC Findings, Including Impact of Sleep Apnea

Plaintiff attributes error to the ALJ's "failing to account for the further impact of plaintiff's obstructive sleep apnea, whether or not deemed to be a 'severe' impairment." (Doc. 9 at 16-17.) In the Sixth Circuit, "the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Higgs*, 880 F.2d at 862. The test is used to "screen out totally groundless claims." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

In the instant case, the ALJ found that Plaintiff's affective disorders were "severe" within the meaning of the second sequential step. (Tr. at 21.) Plaintiff contends that the ALJ improperly omitted Plaintiff's sleep apnea from the list of severe impairments or failed to account for the impairment even if not considered severe. (Doc. 9 at 16-17.) To the extent Plaintiff argues Plaintiff's sleep apnea should have been considered severe, this argument fails because once Step Two is "cleared" by a finding that some severe impairment exists, then the ALJ must consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony*, 266 Fed. App'x at 457. "The fact that some of [Plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* Consequently, any alleged omission from the list of severe impairments does not undermine the ALJ's decision.

To the extent Plaintiff argues that the ALJ failed to consider Plaintiff's sleep apnea at all, I suggest this argument also fails. Under the applicable regulations, the RFC determination must

account for limitations imposed by both severe and nonsevere impairments. 20 C.F.R. § 404.1545(a)(2). As a corollary to this rule, the ALJ should adequately explain his evaluation of the effects of the nonsevere impairments. 42 U.S.C. § 423(d)(2)(b). In the instant case, the ALJ expressly considered "all the medical findings and other evidence that support the physician's statement that the claimant is disabled as a result of her sleep apnea" and, after discussing the specific tests and findings, concluded that sleep apnea "causes only a slight abnormality (or a combination of slight abnormalities) that has not more than a minimal effect on the claimant's ability to do basic work activities." (Tr. at 22.) Plaintiff appears to argue that because the ALJ considered sleep apnea individually, he did not properly consider sleep apnea in combination with the other impairments. (Doc. 9 at 17.) However, "[a]n ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings." *Loy v. Sec'y of Health and Human Servs*, 901 F.3d 1306, 1310 (6th Cir. 1990) (citation omitted) (cited with approval in *Smith-Marker v. Astrrue*, ___ F. Supp. 2d ___, 2012 WL 870850, at *8 (S.D. Ohio Jan. 30, 2012)).

After a thorough examination of the evidence regarding sleep apnea, the ALJ found it caused only a minimal effect on Plaintiff's ability to do work and then in the next section of his decision, the ALJ specifically referred to a finding that Plaintiff did not have a "combination of impairments" that met any Listing. (Tr. at 22-24.) I therefore suggest that the ALJ fully satisfied his duty to consider sleep apnea and that this ground does not undermine the ALJ's decision.

I further suggest that the ALJ's conclusion that sleep apnea had, at most, a minimal effect on Plaintiff's ability to perform work activities is supported by substantial evidence. The medical evidence showed that Plaintiff's obstructive sleep apnea was "mild" and that it did not cause any "airflow obstruction." (Tr. at 405, 456.) In addition, Dr. Rao questioned whether sleep apnea was the only cause of Plaintiff's sleep disruption or whether her "anxiety/depression" might also play a role. (*Id.*)

17

Finally, I suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own statements that she is able to take care of her personal needs, does not need reminders, is able to prepare her own meals, to do laundry and clean once a week for three to four hours, to shop in stores twice a week, to handle her own finances, to paint, and to take the bus to visit her male friend once or twice a week. (Tr. at 52, 56-57, 148-50.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### III.  REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail

with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                            s/ Charles E Binder
                                            CHARLES E. BINDER
Dated: May 17, 2012                        United States Magistrate Judge

**CERTIFICATION**

    I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: May 17, 2012                      By    s/Patricia T. Morris
                                                  Law Clerk to Magistrate Judge Binder